Good morning, Your Honors. May it please the Court, I'm Mark Poster for Appellant and Cross Appellee, Mr. Dufour. I'd like to save a little bit of my time for reply. There's lots of moving parts here, but I'd like to start with the issue about Mr. Dufour's settlement with EWI and EWII in accord with California's Code of Civil Procedures, Section 998. EWI offered to settle with Mr. Dufour for $35,000 pursuant to that section, and it gave him a deadline. We submit it never withdrew that offer. Meanwhile, another defendant, National Acceptance Corporation, made a counteroffer. Well, it was also EWI, not just the other defendant, correct? It was EWI and NAC. Well, yes. And why isn't that a second offer under 998 that extinguishes the first? Well, because under this basic contract law, a second offer that isn't inconsistent with the first offer. We're not talking about basic contract law. We're communicated prior to a valid acceptance of a previous offer, so it extinguished and replaced the prior one. Isn't that what it provides for? Well, except that the new offer didn't change anything as far as EWI was concerned. It was only these other people that wanted to piggyback on it. Changed the amount of the money, correct? They were giving, in fact, more money. They offered more money. Only two people get out this time. Different day, though. There were other people that wanted to be part of this counteroffer. Right. But there was more money offered to the doctor. Instead of $35,000, it was $37,000, correct? Right. So what's the harm in accepting $35,000? I mean, it's... Well, harm has nothing to do with it in the sense of just how the statute operates. Well, I submit that it wasn't a new offer. There was still $35,000 for EWI. And the other two were going to apparently add it for $2,500. And Mr. DeFore wasn't interested in settling with those people for the $2,500. He wanted to accept the settlement for $35,000 with EWI. That offer was never withdrawn. But EWI was part of the second offer. It was EWI and another entity. So the second offer was EWI's second offer. It's just joining with another party. It was still EWI's offer. Well, I submit that from Mr. DeFore's point of view, it sounded like all they were saying was EWI is going to give you $35,000 and these other people are going to give you $2,500. And so he accepted it. And so that's what... He was entitled to accept that offer, which hadn't yet expired under its own I'd like to talk about the statute of limitations issue. This one really covers all the defendants. And here's how the argument goes. Mr. DeFore alleges that defendants conspired to defraud him into a get-rich-quick real estate training program. And then they used that training program to lure into financing the purchase of overvalued properties for which he is burdened with debt to some of the co-conspirators at least for the next 20 years. So the defendants moved for summary judgment on the grounds that, well, you suspected this more than three years before you filed your complaint in 2012. Well, he did retain lawyers to send letters out, right? Yes. And he has an argument. He argues that the defendants misled him completely. They lied to him about the... what their involvement was in all this and whether they were making profits off of any of this. And he alleges that he was misled by all that. Well, he actually filed a lawsuit in 2009, correct? He did. So he must have known something in order to file a lawsuit. Well, he suspected, but he had no idea until he took the deposition of Mr. Staggs in January of 2010 what was really on here in terms of how the various defendants were all sharing in the profits of this conspiracy. But even if the statute started to run when he filed his first lawsuit in 2009, his claims weren't barred by the three-year statute of limitations when he filed in 2012. But put all that aside, the summary judgment motion was just basically one point. You knew before, more than three years before you filed the current lawsuit, that you suspected it and therefore you're supposed to... once there's a discovery, the statute of limitations starts to run. And Mr. Dufour comes back and says, wait a minute, I allege a conspiracy here. There are overt acts that are still going on right now. I'm still paying on these mortgages and you're profiting from it. And so the conspiracy is still going and the statute of limitations doesn't start to run until the conspiracy is over. Who was still profiting? Which one of the co-conspirators at that time was still profiting? Well, the people that he was paying the mortgage to. And which defendants are they? Well, I believe it was Freedom and there was another defendant that's out of the case now. Were there any allegations or evidence that there was fraud in the financing process of the mortgages? Yes. Well, yes, because, yes, because they overvalued the properties and the banks didn't do anything to question whether these properties were overvalued. He didn't know that all these, the other, that the successful people who had participated in the program were actually just flipping these properties around. Sure. But the overvaluation and all of the fraudulent acts that are alleged all occurred at a time when the statute of limitations had already run. Right. So I'm trying to figure out your theory as to extending the statute of limitations. It doesn't extend it. It doesn't start to run until the last overt act in the conspiracy is this giant plan that you get this get rich quick program. You lure people into it and then you pass them along to people who sell them overvalued properties and everybody shares in the profits of what's going on. But if he had the cash, he could have paid for all of the properties in cash, right? I'm sorry, say it again. He could have paid for the properties in cash. Well, I don't know that he could have. I don't know. That's, no, he wouldn't have, he wouldn't have financed it, I don't think. I mean, part of the part of the get rich quick scheme is no money down. You know, we get to, we get you all this great financing. So you're saying that the evidence shows that the people involved in financing also participated in the conspiracy? Well, sure, they were benefiting from, from. But how did they participate in the conspiracy? I understand they financed it, but how did they participate in your view in the conspiracy? Because there was a Mr. Staggs who was working for finance companies and also claimed to be a real estate broker and was passing along money to the, to the earlier defendants to prosper and prosper was, everybody was profiting all the way back. So what do you contend is the last overt act? Still going on. He can't, he's stuck with these mortgages. Well, I understand he's stuck with the mortgages, but what's, what's the last overt act on the part of the defendants? Collecting, collecting the mortgages. And I've cited a couple of California case, cases on this, the Wyatt case and the people versus Beaumont where the court says the statute is told even after the fraud is discovered, for so long as the sheer economic duress or undue influence embedded in the fraud continues to hold the victim in place. And he's stuck with these mortgages. He can't walk away from the properties because they're in Mississippi and there's no anti-deficiency law in Mississippi. He's stuck with this and he continues pouring it out. In the Beaumont case, the court said defendants were still collecting on lawful limb. So which defendants are collecting here? Which defendant, you said it's the mortgage is, he's still collecting the mortgage payments. So which defendant is collecting the mortgage payments he's here in this case? I don't know. I believe it's freedom. The mortgages are actually attached to the fourth amended complaint. Freedom is named on most of those. So the Superior Court found that Wyatt was not applicable because there were different types of misrepresentation and Wyatt was a misrepresentation of the loan terms and here it was the interrelationship, right? So I mean, do you, tell me what, why you think the Superior Court got it wrong when it said Wyatt did not apply? Well, it was the Superior Court and the District Court separately. There was another thing. Why is it wrong? Why was their analysis wrong? The analysis is when you make a summary judgment motion and it's on a defense, you have to show that there's no theory under which the defense, that there is no defense to the defense. You have to show that that's your burden. And they didn't do that. They just said it started back then. And he came back and said, but I'm alleging all these, these overt, continuing overt acts. And my question probably wasn't clear. The courts below said basically that Wyatt, the case upon which you rely, didn't apply to this case because there were misrepresentations and loan terms in Wyatt and there was a different type of alleged misrepresentation in this case. Well, I just want to, I just want to get your position on the rule from Wyatt. So long as the sheer economic duress or undue influence embedded in the fraud continues to hold the victim in place. So I don't see that. I think that that's a distinction without a difference in terms of, of the, of the victim of the, of the, of the fraud. He's still paying out. It's not like an automobile accident and you're injured. And then five years later, you come back and say, I'm still injured. This is, it's different because the, this is the ongoing conspiracy with these overt acts to collect, to collect on the mortgages that he would like to rescind if he could. Do you want to reserve some time for rebuttal? I do. Thank you, Your Honors. Good morning, Your Honors. My name is Jared Ede from Green and Hall appearing on behalf of Respondent Freedom Mortgage today. It's an honor to be here and may it please the court. I think the issue with this case with regard to freedom is very simple. And that is, should the plaintiff in this case be allowed to continually and repeatedly sue over the same wrongs for a period of 30 years, simply because he has a 30 year mortgage. California case law, the district court and the lower state court in this case said no. The issue here for plaintiffs is an attempt to get around that no. The first issue that I'll address, and I'm going to address a total of four issues in my time, the burden of proof, the last overt act doctrine, equitable tolling as it applies to freedom. And finally, the fact that freedom was ultimately named in the present lawsuit as a DOE defendant after the statute of limitations had already expired. The burden of proof I'll touch on just briefly because it is a relatively minor issue here, but it's an important point to make, which is in this case here, when we're dealing with this appeal, appellant says the burden is on us to prove that, for example, the last overt act doctrine does not apply. Interestingly, that's completely wrong. In this particular case, the burden of proof does not rest on freedom to prove that the last overt doctrine does not apply. Our burden simply is to prove a prima facie case that the statute of limitations has expired. Once we prove that, the burden shifts over to the appellant to decide that, or to prove, excuse me, that a non-statutory exception applies. And I'll read specifically, this is actually from plaintiff's supplemental brief to the lower state court when he was asked this direct question. Now, appellant in this particular action is continuously saying, well, I put it at issue in my complaint. In my fourth amended complaint, I alleged a conspiracy. I alleged I was continuing to make payments. And that should be enough to put it at issue such that if you are going to prevail on the statute of limitations defense, you have to show the last overt act doctrine does not apply. Interestingly, when this issue was brought before the state court, this is what appellant said. An attorney facing down a dispositive motion should not rely on mere allegations in his or her pleadings to show a triable issue of material fact exists as a basis for denying the showing a triable issue of material fact exists. Appellant did not do so here. He had an obligation and he continues to say, well, I'm making payments to this state. Yet even as we sit here today, is unable to identify to whom, and frankly has admitted that he doesn't know to whom those payments are being made. So it's your position that those payments are not being made to freedom? Not to freedom, no. And that's the issue here, Your Honor. In terms of the evidence that was put in front of the state court as well as the district court, the only evidence of supposed payments that was presented at that time were the attached mortgages to the Fourth Amendment complaint, which proves nothing more than he had took out mortgages. It does not prove that he ever made a single payment under them, let alone that he made payments to the specific defendants here. With regard to, for example, payments to freedom, there's no evidence of that despite the fact that he was given a specific opportunity by the court to address this issue when he raised Wyatt on the MSJ. He was given an opportunity to brief this issue and he failed to produce any evidence. So simply put, he has not met his burden of proof. With regard to the second issue, the Last Overt Act Doctrine, I believe this perhaps is the most important issue when it comes to freedom. His argument essentially is that the Last Overt Act Doctrine should say any time that a mortgage is in any even tangentially involved in a conspiracy that therefore the statute of limitations does not expire until the last payment on that mortgage is made. Frankly, that makes a mockery of the Last Overt Act Doctrine. The Last Overt Act Doctrine, as it is discussed in Wyatt, as it's discussed in Beaumont, as it's discussed in, you know, frankly, Vaca touches on it as well, it raises an important distinction, which is the Last Overt Act Doctrine does not equal a decision that simply says so long as you are continuing to sustain injuries, then the Last Overt Act has not happened. That's not what that doctrine says. The doctrine says there is a goal of conspiracy. What is that main goal of the conspiracy? When that goal has been accomplished, the Last Overt Act has been done. And anything that happens after that, continuing injuries, simply does not support a stop on the statute of limitations. Take counsel's view of it, though. This is a conspiracy in which all the conspirators want to enrich themselves by getting someone to buy these properties. It's alleged that one of those conspirators is the person giving the mortgage. So that person continues. It's not that he, the other person is injured or that the plaintiff continues to be injured. It's that the co-conspirator continues to be enriched by the conspiracy by receiving these mortgage payments on these properties that are overvalued. If the mortgager is in fact a member of this conspiracy, why isn't that similar to Wyatt? Well, here's the reason why. It's because in Wyatt, for example, as opposed to our current case, there simply was no, you know, in Wyatt, excuse me, let me back up, in Wyatt as opposed to our current case, there were specific fraudulent misrepresentations as to the terms of the loan and therefore the payments that were going to be made under the loan. There were no such misrepresentations that occurred here. Importantly, when you look at, for example, the way that plaintiff or, excuse me, appellant describes the conspiracy here, he describes it simply as a get rich property flipping scheme, not a get rich and, you know, convince me to take out a 4% interest rate mortgage loan scheme. There's a huge distinction, therefore, between the two. Specifically, another interesting caveat with this is if you look at the people who supposedly defrauded plaintiff, Mr. Dufour in this case, the appellant claims that Staggs, Greg, Prosper, EWI, Allen, all these people said, hey, come buy these properties. Now, not a single one of them is benefited by Mr. Dufour continuing to make payments, not a single one. They couldn't care less whether he defaulted or not. All they cared about was buy the property. But if one of their conspirators benefited from it, it's a conspiracy and it would be arguably the last overt act. I mean, if everybody together in this, I'll make some money from X and you'll make some money because you'll do the mortgage. If the conspiracy was to get him to take on a certain type of mortgage where the payment, again, was the goal of the mortgage, get that payment done. That's not the case here. There's absolutely no allegation and no accusation whatsoever that the payments have anything to do with the conspiracy or the goal, the main goal of the conspiracy, which is what the last overt act doctrine says is important in these cases. And so. Your seven minutes have expired. Thank you very much. May it please the Court. Good morning, Your Honor. We're here for one simple reason. It's an undisputed fact and Your Honor pointed it out at the very outset. We're here for the reason that Mr. Dufour failed to prosecute a timely filed complaint in the L.A. Superior Court that was dated May 28th, 2009. Dufour's filing of that complaint was dismissed, interestingly, for failure to prosecute. That is a dispositive fact in this case as it relates to the central questions that Your Honors have just inquired concerning because it undisputed the evidence, evidences that Mr. Dufour and his counsel prior to that time had a good faith, factual and legal sufficient knowledge and basis to proceed with the actual filing of a lawsuit against the defendants. All of the elements necessary to sustain that complaint were present and he filed accordingly. Now, today we hear Dufour's demands for equity that the statute of limitations should have been told or that the running of it should be equitably or the defense should be equitably stopped. But the fact remains Mr. Dufour created this problem. Neither the defendants nor anything they did or did not do, as now suggested, has anything to do with Mr. Dufour's delay. We hear in the briefs an argument of lack of understanding or of delayed discovery or concealment that somehow the defendants induced his delay. Well, these are after-the-fact theories that are designed to avoid the consequences of his admitted accrual of the causes of action and his failure to timely prosecute the same. The suggestion that his 528.09 complaint was not filed in good faith, factually and legally supported, would effectively acknowledge that his counsel engaged in an abusive process or violated Rule 11. That's not the case. Assuming the court feels the need to look beyond that 528.09 complaint, which I submit you do not have to even look beyond that, we do not have to even entertain the last overt act doctrine or any of the arguments that are presented to equitably toll or stop the defenses that have been asserted. If the court wants to go beyond that, the soundness of both the superior court and the district court's analysis is amply evidenced in the record. And we would ask three questions. What did DeFore know and when did he know it? That's the first question. What did he actually allege in the Fourth Amendment complaint, which I'd like to briefly address? And then finally, and very importantly, was admissible evidence presented in support of those allegations, assuming the allegations were sufficient? We know as of 328.08 that Mr. DeFore knew, because he'd received an email confirming this, that Prosper, my client, had an ownership interest in Staggs Financial and that it had an exclusive referral relationship. Moreover, as of 5.6.08, Mr. DeFore's lawyer confirmed the suspicions as well as the knowledge of Mr. DeFore of all of the elements necessary for the assertion of the fraud claim against the defendants, as well as Prosper's financial interest in Staggs Financial. DeFore's knowledge is evidenced by a number of things. Time is limited, but if the Court would take the time to look at the 5.6.08 letter, that letter says, first of all, Mr. DeFore testified that he reviewed it, he approved it, and he authorized his lawyer, Sherman, to send a demand letter. That letter includes no less than nine direct and indirect, or indirect, threats of litigation, and I quote, quote, unquote, court proceedings, quote, unquote, legally actionable causes of action, quote, unquote, lawsuits, government actions, and it specifies at least eight specific claims for relief, including fraudulent inducement, detrimental reliance, promissory and equitable estoppel, and I think significantly, it references hundreds of thousands of dollars in estimated damages that he believed he had been injured with respect to as of that time. It confirms, and I quote, Mr. DeFore's understanding that Prosper, in fact, had failed to disclose the financial relationship that Prosper had with Staggs and that he had relationships with these other businesses and the transactions in question. It also confirmed his understanding that Prosper might earn revenues and might be entitled to as much as 30 percent of the value of such transactions, and importantly, finally, it seeks specific redress, quote, unquote, to, quote, resolve these concerns without going to court and seeks a reasonable compensation consistent with the estimated hundreds of thousands of dollars. Interestingly, before a response was given to that letter on 521, a second letter from Mr. Sherman was sent in which he also threatens other legal actions because no response had been received, and before he received Prosper's response, he actually filed a 525-08, or he signed, I should say, a 525-08 complaint with the California Department of Corporations as well as a 525-08 complaint before the Mississippi Department of Banking and Consumer Finance, and in those complaints, he references the mortgage company's misleading actions and he mentions Mr. Staggs in particular. Now, the tie between Prosper and Staggs, of course, is his alleged undisclosed relationship. He was well aware of that, as mentioned in the five letter, the 608 letter. In response to that letter, Prosper's general counsel confirmed the facts asserted. Yes, he said, you were referred to DeFore, or Prosper did refer DeFore to Staggs. Yes, there was a small ownership interest between Prosper and Staggs. He goes on to say a number of other things, but consistent with Mr. DeFore's admission in the enrollment agreement that he signed, that he was responsible for his own decisions and should consult legal accounting and other advisors in connection with any purchase decision that he might make. The response of Mr. Brunt specifically denied liability and said, Prosper, quote, cannot be responsible for financial losses incurred by a rogue employee of a mortgage company for real estate investment decisions. Significantly, Your Honors, no critical information was withheld or missing, and despite the fact that, with your argument to the contrary, Mr. DeFore had an adequate understanding of all of the elements of the eight specific claims that were mentioned. Case laws ---- I take it that Prosper had no role to play in obtaining financing for these properties? None, Your Honor. That is correct. Prosper is an education company, a certified Robert Allen education provider, if you will. It offered a 10-week course. And, of course, as you might imagine, the record is disputed as to, you know, what if any role we have. But the answer to the question is no. You're down under six minutes. Your Honors, if you have any other questions, I'm happy to entertain them. Otherwise, I'll cede the time. Thank you. Good morning, Your Honors. Charles Pershon on behalf of the EWI Defendants. And I'd like to turn to the Section 998 settlement issue. And counsel's comment was key, because he said, well, from Mr. DeFore's perspective, this was simply a different offer. That's critical, Your Honors, because it doesn't matter what Mr. DeFore's perspective is. His point of view is irrelevant. What matters is the objective manifestation of the offeror. Case law is clear that the offeror is master of his or her offer. And it was clear on the 23rd of September on 2013, though it was loosely and perhaps a better word could have been chosen than counteroffer. But when NAC had been served while the original settlement offer was pending, that then spurred the EWI parties, who are also representing now NAC, to say, oh, you've sued another one of us. We're going to change our offer. That offer, Your Honors, extinguished the first offer. And that is clear black letter law. In my remaining brief time, Your Honors, I'd like to touch on the sanctions issue. This is near and dear to my heart, having litigated this case for four years. And the crux here really are the two complaints, the 2009 complaint in LA State Court, in LA Superior Court, rather, and the federal complaint in 2011. Had those two complaints not been filed, this might be a reasonable case to deny sanctions because counsel would have had a justification to say, look, I understand that you believe the statute of limitations may have run, but I don't believe that, and I'm going to go to court and make that argument. We all have that right. This is different. He filed two prior cases that are, if not verbatim, they're darn close in substance and causes of action to what this instant case eventually alleged. Even if the district court was correct in finding that the statute of limitations barred the claims, given Wyatt and Beaumont's analysis, why is it frivolous to try to reassert the lawsuit based on those cases? Well, those cases weren't raised until years into the lawsuit, Your Honor, so they didn't come forward with the theory of, well, we understand we have a statute of limitations problem, but there are these cases to overcome it. It happened after the fact. And more to the point, Your Honor, in the 2011 federal case, one of our co-defendants, Prosper, did file a motion to dismiss, and the case was dismissed for lack of subject matter jurisdiction. It didn't relate to the statute of limitations. Correct, Your Honor. That's absolutely right. But the critical point is it put defendant, put plaintiff, rather, on notice. It put Mr. Dufour on notice that there was a statute of limitations. And he never came forward with Wyatt. He never came forward with Beaumont or Vaca or some other explanation to try to overcome that. In fact, it wasn't until the hearing on summary judgment before the trial court that he came forward and said, look, I have a case. I have a case. So we would submit, Your Honor, that that 11th-hour justification which the trial court eventually decided was irrelevant anyway and inapplicable anyway, is not enough for a post hoc justification for him to have brought this suit. Well, he's got a theory. He can bring a suit. And there was a new theory. I'm sorry, Your Honor. He had a new theory. He had a theory of last-of-order act based on two California cases. And statute of limitations is a defense, too. I mean, it's your defense, correct? Correct. Correct, Your Honor. But the point is he knew about it. So tell me how the district court abused its discretion, especially on the sanctions motion. We give a lot of discretion to the district court. What would you say is the fundamental, other than re-arguing what you argued in front of the district court, why would we say that even if we disagreed with the decision, why should we reverse? In my view, Your Honor, to rule otherwise would do disservice to the California Civil Procedure Code and Federal Rule 11, which requires attorneys to make an inspection. It is incumbent upon all of us, before we file a case, to do some investigation and some research to make sure those claims are valid. Plaintiff was on notice here. Mr. Dufour was on notice here. By the time he filed the instant case that they already had a statute of limitations problem. He was already outside of the statute of limitations. He didn't come in and plead, Wyatt. He didn't come in and address Wyatt or Beaumont or Vaca in his complaint, in any of them, until it was the summary judgment hearing. That 11th-hour, last-minute justification for why this case is saved from sanctions is not sufficient. And what case says that? This case, his case, Mr. Dufour's case. I mean, the district court said the court is not convinced that the filing of the statute of limitations is sufficient to justify a warrant of sanctions. So that's a judgment call. I understand. What case says the judgment call is wrong, that we have to reverse in those circumstances? Well, because it's a judgment call, I don't know that I can ever point to a case, unless it's exactly factually similar to say that it's wrong. I'm simply saying to this panel, under the State provision, the State equivalent of Rule 11 and under Rule 11, this violates those provisions. Thank you, counsel. Unless the Court has questions, I'll yield my time. Thank you, counsel. Rebuttal. Just on the last point, I'm sorry counsel is offended by all of this, but that's not the question. It's what does the district court think, and the standard is it's a discretion. It sounds like you very narrowly escaped sanctions. Well, not me, personally. But if you're able to, if you are, the Fourth Amendment complaint alleged a conspiracy and continuing damages. And so why can't counsel and the client rely on that in arguing against the summary judgment motions? The Supreme Court has said that the standard is abuse of discretion all across the board on a sanctions motion. And the Court obviously thought about it and decided not to award sanctions. So I think that's the end of the story on that argument. As far as the scope of the conspiracy, Mr. DeFore was lured into this no money down, get rich quick scheme that in part relied upon the fact that you had successful students. That's how these programs work. We have successful students who will tell you how much money they made. Well, they made money by flipping these properties and getting this financing. And so he was the guy at the end of the line that got stuck with the properties and having to pay the, having to pay. He doesn't, it's, the defense has never said, no, no, you're, you're not collecting money from us on this motion. In fact, the money goes to a loan servicer and then it moves on to the, and then it moves on to the person that took out the, gave the loan to start with. But that's, all that is beyond the facts that are in the record here. So, uh, but you're not alleging any fraudulent fraud in the mortgage is themselves. No, no, actually the complaint does allege that, that the properties were overvalued that the, that the, I'm talking about the terms of the mortgage. I mean, I understand, I understand that the term, I understand what you're talking about. I just want to make sure I understand the terms of the mortgage or the way the loans are administered. Uh, well, well, yes, that's right. Yes. What you're saying is that you were fraudulently induced into investing basically. Right. And then you're stuck and then you're, you're stuck with this and you have no way out. And they, and presumably they knew that perfectly well. Um, so somebody said, well, it's all, it's all tangentially related, but it's not. Everything right down the line is, is, is, is part of this whole scheme. The, the original people can't sell their program if they don't have successful students and successful students don't, can't be successful without flipping properties and, and, and getting these, uh, uh, overvalued properties that, uh, and, and getting the, the, uh, the mortgages on them. So it's all part of the same scheme. Where in the record can we look to find who the mortgage payments were made to? Is that in the record? Only, uh, no, but, but, uh, it is not, uh, other than the, that the, uh, the mortgages are all attached to the fourth amended complaint. And would you agree that none of the defendants here today are currently receiving money that they're... No, I don't agree about that. So who is still receiving money in your view? I realize this takes us outside the record. I understand that a loan servicer is receiving the money and then, and then it goes on to the, whoever, uh, uh, goes on from there. They didn't put in any evidence. We haven't put in any evidence about this at all. All we know from the complaint is that he, there's all these mortgages attached, attached to the fourth amended complaint and he's still paying on them. That's what he says. Um, as to whether, uh, um, he should, Mr. DeFore should have put on evidence in the superior court when he brought up the Wyatt issue. I still submit that it's up to the defense to, to, if, if, if the, if it's on the face of the complaint that there is allegedly a tolling of the statute of limitations, that it's up to them to show that it is not told at least in the first instance on a summary judgment motion. They didn't do that. It's not his job to rebut something that they have, they have yet to put an issue. Well, the facts are pretty much undisputed, weren't they? In the sense that, uh, your theory was he's, he's, he keeps paying and that's, therefore it's a continuation of the conspiracy, right? Correct. And they did, they didn't dispute that. They didn't dispute that. That you were, that your, your client was paying. They did not. Right. So given that there was no genuine issue of material fact on that, then the court could decide that as a matter of law, right? It doesn't, when you're talking about burdens, uh, we, we often think of them evidentiary burdens, but here, uh, they, they, you raised the issue and the, the, it was a straight up legal question. Yeah. But on a summary judgment motion, you submit a separate statement that says, here, here are the facts. What facts did you dispute? We were disputing what they said, oh, you knew back in 2008. Right. Okay. And he was disputing about whether, uh, whether he, he'd been misled and there was an estoppel. He was just addressing the issue that they, that they raised in, in their motions. That's all they talked about. They didn't talk about, uh, any of the other aspects of the, of the complaint. Thank you for your careful attention to this matter. Thank you, counsel. Thank you all for your arguments. Uh, the case just heard will be submitted for decision and we'll be in recess for the morning.
judges: Thomas, Nguyen, Amon